IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANTHONY J. SMITH and FLYING A.J.'S
TOWING COMPANY, LLC,

                    Plaintiffs,                          OPINION AND ORDER

         v.                                              18-cv-523-wmc

CITY OF JANESVILLE, DAVID J. MOORE,
JIMMY G. HOLFORD, JR., JIMMY G.
HOLFORD, III, and JOEL P. MELTON,

                    Defendants.
_____

         Under 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth

Amendment, plaintiffs Anthony Smith, who is African American, and his company, Flying

A.J.'s Towing Company, LLC, claim that various members of the Janesville Police

Department and the City of Janesville delayed placing Flying A.J.'s on a new, "no

preference" tow list in mid-June of 2016 and then removed it from the list altogether in

August of 2016, based on Smith's race and in retaliation for his complaining about race

discrimination.  Plaintiffs brought similar claims against the Town of Beloit and its chief

of police in 2010 based on a far more egregious set of facts, including "staggering," blatantly

racist remarks by the then chief of police.  *Smith v. Wilson*, 705 F.3d 674, 676 (7th Cir.

2013).  After a three-day trial, the jury in that case returned a mixed verdict, finding that

race was a motivating factor in the defendants' actions against plaintiff, but ultimately

finding no liability for failure to prove causation.  *See id.*  This court observed how "painful

[it must be] to learn that one's worst suspicions are true when it come[s] to the motives of

a public official, particularly if the official is the chief of police."  *Smith v. Wilson*, No. 10-

cv-062-wmc (W.D. Wis. June 16, 2011) (post trial order, ECF No. 273).

For plaintiffs, that same sentiment no doubt resonates here, but it is only an echo, for this is a different case with different facts. Pending before the court is defendants' motion for summary judgment on all claims (dkt. #14), and a careful examination of those facts as derived from the record in this case compels the conclusion that plaintiffs have not provided sufficient evidence to allow a reasonable jury to render a verdict in their favor. Accordingly, the court will grant defendants' motion.

UNDISPUTED FACTS[1]

## A. Overview of the parties

Plaintiff Anthony Smith is African American. Smith and his wife own and operate plaintiff Flying A.J.'s Towing Company, LLC, which was established in 2002.

Defendant City of Janesville is a Wisconsin municipal corporation. The remaining defendants were at all relevant times employees of the Janesville Police Department. Specifically, defendant David J. Moore was police chief; defendant Jimmy G. Holford, Jr. was deputy police chief; defendant Jimmy G. Holford, III was a sergeant[2]; and defendant

---

[1] Viewing the facts in the light most favorable to plaintiffs as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted. At the outset, the court recognizes defendants' numerous objections to plaintiffs' proposed facts on the grounds that plaintiffs cited deposition transcripts and exhibits that had not yet been filed with the court. Nine days after submitting their proposed findings of facts, plaintiffs filed the missing deposition transcripts and exhibits with the court. Although the court agrees that defendants' objections were appropriate at the time, the court overrules the objections insofar as they have been remedied by plaintiffs' belated filings.

[2] As there are two parties whose last name is "Holford," the court will refer to Deputy Chief Jimmy G. Holford, Jr., as "Deputy Chief Holford" or simply "Holford" and will refer to Sergeant Jimmy G. Holford, III, as "Sergeant Holford III" or "Holford III."

Joel P. Melton was a police officer. All were sued in both their individual and official capacities.

**B. Creation of the Janesville "no preference" tow list**

This case centers around Flying A.J.s' placement on and then removal from the Janesville Police Department's "no preference" tow list. Companies placed on the tow list are eligible to be called on by the police department to tow vehicles in cases where the vehicle owner does not have a preference as to what company to use.

Before June 2016, the Janesville Police Department had called companies on the Rock County tow list, but after a number of complaints, Deputy Chief Holford recommended to Chief Moore that the department create and maintain its own list. Moore agreed, and together Moore and Holford created an application form for the department's new list. On or before June 5, 2016, the form was sent to all the companies on the old Rock County list, which included Flying A.J.'s. The form included a list of required qualifications and requested that the applicant "sign and return [the form] by June 23, 2016." (Smith Dep., Ex. 10 (dkt. #13-10) 2.) Within ten days, four towing companies had submitted applications. After Holford determined that all of these companies met the requirements set by the police department, Moore approved the initial list of four towing companies, and the department announced that list on June 15, 2016. The owners of all four towing companies were white.

Six days after the initial list was announced, but two days before the June 23 application deadline, Smith submitted Flying A.J.'s application to be on the tow list. Deputy Chief Holford confirmed his receipt of the application, but informed Smith that

the application had been placed "on file in the event [that the Janesville Police Department] needs to replace or add to its current list." (Smith Dep., Ex. 14 (dkt. #13-14).)

Smith then lodged a complaint with the Janesville City Manager's office claiming that the police department had discriminated against him because of his race by placing Flying A.J.'s application on a "waiting list." The complaint was forwarded to Police Chief Moore, who then informed Deputy Chief Holford. The next day, Moore called Smith to discuss the complaint. On the call, Moore assured Smith that race had nothing to do with the make-up of the initial list and told him that if Flying A.J.'s met the police department's requirements, it would be included on the tow list.

Moore then instructed Deputy Chief Holford to determine whether Flying A.J.'s met the tow list requirements. On July 12, 2016, Holford met with Smith at the Flying A.J.'s Janesville office. Smith stated that during the meeting, Holford warned him that if he mentioned race discrimination, "the interview would be terminated and Flying A.J.'s application for the tow list would not be considered." (Smith Decl. (dkt. #25) ¶ 11.)[3] Later that same day, the Janesville police department issued a new tow list. In addition to the four previously-included towing companies, Flying A.J.'s and another tow company -- KB Towing -- had been added to the new list.

---

[3] Holford testified that he did not say anything to that effect. (Holford Dep. (dkt. #35), 16-17.) Although disputed, the court must accept Smith's version of the conversation for purposes of deciding defendants' motion for summary judgment.

## C. July 25 traffic incident

On July 25, 2016, Sergeant Holford III and Officer Melton responded to a car crash. One of the cars involved in the crash required a tow. Because Flying A.J.'s was the next company on the tow list rotation, and the car's owner expressed no preference as to what tow company to use, it was called.

Although the parties disagree about some of the events on July 25, 2016, they do not dispute the following core facts: Flying A.J.s' driver, Calvin Richardson, promptly arrived at the crash site; Richardson neither spoke to any police officer at the scene nor to the vehicle owner, Susan Paul; and Richardson was informed by Flying A.J.s' dispatcher that the vehicle owner wanted the car delivered to Rock County Honda, but Richardson first took the car to Flying A.J.s' Janesville lot, intending to deliver the car to the Honda location the next morning.

After the incident, Melton followed up with the vehicle owner. Paul said that she was unhappy with the tow service she received and that her GPS unit was missing from her car. Later, Officer Melton documented the July 25, 2016, incident in a memo, which was submitted to Deputy Chief Holford. The memo noted that: the Flying A.J.'s driver "refused" to give Paul a ride home; the driver did not consult with Paul; Flying A.J.'s "wasn't willing" to tow the car directly to Rock County Honda but would drop it off the next morning; and that "the experience with [Flying A.J.'s] was disappointing." (Melton Decl., Ex. 1 (dkt. #20-1).)

## D. Removal from tow list

On August 1, 2016, Holford emailed Smith, attaching Melton's memo, which he

referred to as a "complaint" about Flying A.J.'s service. (Holford Decl., Ex. 8 (dkt. #18-8) 1.) Holford's email also stated that he was "interested in [Smith's] response" as he investigated the issues raised in the complaint. After receiving no response for a week, Holford emailed Smith again on Monday, August 8, this time asking him to "[p]lease respond by Thursday, August 11th." (Holford Decl., Ex. 8 (dkt. #18-8) 1.) Later that same day, Holford also stopped by Flying A.J.'s Janesville address twice, but did not encounter Smith or any other Flying A.J.'s employee. Both times he knocked on the door and called out, but concedes he did not try the door or checked around the garages. He further testified that the lights were out and that he did not see or hear any activity.

That same evening, Smith responded to Holford via email, addressing both main issues raised in Melton's memo, as well as voicing general concerns about race discrimination and discriminatory policing in Wisconsin. Referring to the July 25 incident, Smith wrote that after loading up the car and ensuring the road was clean and safe, no customer or officer was in sight. He further explained that Paul's vehicle was not taken straight to the Honda dealership because it would have been closed by the time the driver arrived. He also advised that Paul never asked for a ride home and any allegation that Flying A.J.'s refused to give Paul a ride home was a "bold faced lie from somebody trying to get us removed off of the tow rotation list." (Holford Decl., Ex. 9 (dkt. #18-9) 1-2.) Finally, he expressed his concern that Officer Melton's memo included "trumped up charges," that "[s]ome of these officers just look for a reason to shoot and kill an African American," and that he "no longer feels safe because of these allegations." (*Id.*)

The next morning, Tuesday, August 9, Deputy Chief Holford emailed Smith, stating that he thought it would be most productive for Smith to stop by his office on Thursday, August 11. (Holford Decl., Ex. 10 (dkt. #18-10) 1.) Smith neither responded to this email nor did he come to Holford's office on August 11, prompting Holford to email Smith again and propose another meeting, this time on Tuesday, August 16. (Holford Decl., Ex. 10 (dkt. #18-10) 1.) He warned Smith that "[i]f you fail to respond I will be forced to suspend your company from the No Preference call list." (*Id.*)

Meanwhile, Holford also continued his investigation into the July 25 towing incident with Paul. On August 14, he reviewed Officer Melton's body cam footage at the scene of the crash, and on August 15, he drafted a memo to Chief Moore detailing his concerns about Flying A.J.'s towing. Among other things, Moore stated that "[a]fter meeting with Mr. Smith on Tuesday and obtaining his side of the story I will render my final decision on the matter." (Smith Dep., Ex. 22 (dkt. #13-22) 1.) However, when Smith neither responded to Holford's email nor attended the proposed August 16 meeting, Holford informed Moore via email that he intended to ban Flying A.J.'s from the tow list indefinitely. On August 29, 2016, Moore finalized and signed a letter informing Smith that Flying A.J.'s would be removed from the no preference tow list for one year. (Moore Dep., Ex. 5 (dkt. #17-5) 1-2.)

OPINION

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "constru[e] all facts and draw[] reasonable

inferences in the light most favorable to the non-moving party." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 977 (7th Cir. 2014). Plaintiffs also urge, and the court agrees, that the court must "be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). However, the fact remains that the burden of proof rests with the plaintiffs. To survive summary judgment they "cannot merely allege the existence of a factual dispute." *McPhaul v. Bd. of Comm'rs of Madison Cty*., 226 F.3d 558, 563 (7th Cir. 2000), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Instead, they "must supply evidence sufficient to allow a jury to render a verdict in [their] favor." *Id.* For the reasons explained below, plaintiffs have failed to do so.

## I. Municipal liability after *Monell* and *Pembaur*

As a threshold matter, defendants argue that the City of Janesville should be dismissed because none of the alleged unlawful actions took place pursuant to a local policy or custom, and as such, it is immune from suit under the Eleventh Amendment. The argument is somewhat inexplicable after the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (plurality opinion), but the court will address it briefly.[4] In particular, the court agrees

---

[4] Because official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent," this argument about the City of Janesville's liability also applies to the official capacity suits brought against the other defendants. *Monell*, 436 U.S. at 690 n.55.

with plaintiffs that the salient legal question here is merely whether Moore was the final policymaker, and further that plaintiffs alleged sufficient facts for the court to conclude that Moore held the requisite policymaking authority.[5]

In *Monell*, the Supreme Court held that a municipality may be held liable for a deprivation of right under § 1983 if the deprivation had been caused pursuant to the municipality's policy or custom. 436 U.S. at 694. The Court later clarified that *Monell* also allowed for municipal liability "for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480.[6]

Here, the record demonstrates that Moore was both the final decisionmaker *and* policymaker with regards to the tow list. Indeed, both sides agree that Moore had "final authority" to add or remove companies from the list. Moore was also indisputably the one who decided that the police department manage and maintain its own list and Moore, with input from Holford, set the requirements for the tow list. (Defs.' Reply to Pls.' Resp. to Defs.' PFOF (dkt. #37) ¶ 13). Finally, there is nothing to suggest that Moore's management of the list was overseen by any other part of the city government. In fact, when the city manager received Smith's initial complaint about being put on the "waiting

---

[5] Somewhat counterintuitively, this is a question of law, not of fact. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury.").

[6] Of course, just because an individual is the final *decisionmaker* does not necessarily make him the final *policymaker* on those issues. *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 675 (7th Cir. 2009). To be a final policymaker, the official must be "responsible for establishing final government policy on a particular issue." *Id.* However, a court may look beyond "positive law" to determine whether the official had policymaking authority as a matter of custom. *Id.*

list," the city manager's office forwarded that complaint to Moore for resolution, stating expressly that Smith "called the [City Manager's Office] as he would like the City Manager to investigate but we'll let you handle it." (Holford Decl., Ex. B (dkt. #18-2) 2-3). Given these undisputed facts, the court agrees with plaintiffs that Moore was responsible for establishing final government policy with regards to the tow list.

## II. Race discrimination claims

Plaintiffs argue that defendants discriminated against them on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1981.[7] Both claims are properly brought under 42 U.S.C. § 1983. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) (explaining that § 1983 creates a private cause of action for violations of certain rights secured by the constitution); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) (holding that § 1983 provides the exclusive remedy for violations of § 1981 by state and local actors).

Although the Equal Protection Clause and § 1981 proscribe different types of discrimination, both claims require a finding of intentional discrimination. *See Washington v. Davis*, 426 U.S. 229, 240 (1976) (requiring a purpose or intent to discriminate to

---

[7] Defendants have twice mischaracterized plaintiffs' Fourteenth Amendment claim. In their first brief, they apparently understood plaintiffs to be bringing a claim under the Amendment's Due Process Clause, rather than the Equal Protection Clause, of the Fourteenth Amendment. Despite being corrected in plaintiffs' opposing brief, defendants' reply brief somewhat obtusely interprets plaintiffs' correction to mean that they are making a *substantive* due process argument. The court reminds defendants that the Fourteenth Amendment's Equal Protection Clause provides rights distinct from the Due Process Clause, *see* U.S. Const. amend. XIV, and that plaintiffs' claims of racial discrimination are properly brought under the former clause.

establish a violation of the Equal Protection Clause); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 396 (1982) (holding that a § 1981 claim "reaches only intentional discrimination"). Further, both claims use the same methods of proof to evaluate the existence of discrimination. *See Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981 and § 1983.").

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit clarified that the legal standard for claims of discrimination is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race or other protected status caused the adverse action. *Id*. at 765. Although *Ortiz* left in place the *McDonnell Douglas* burden-shifting framework, *id.*, plaintiffs do not purport to employ the *McDonnell Douglas* or any other hybrid standard to make their case. (Pls.' Opp'n Br. (dkt #30-1) 7-8.) Rather, they ask the court to follow the Seventh Circuit's admonition in *Ortiz* to evaluate the evidence "as a whole." (*Id.*) Generally speaking, plaintiffs contend that defendants discriminated against them by: (1) delaying Flying A.J.'s place on the tow list; and (2) subsequently removing Flying A.J.'s from the list.

## A. Defendants' delay in placing Flying A.J.'s on the tow list

The first allegation of discrimination arises out of defendants' delay in including Flying A.J.'s in the tow list. When Smith submitted his application to be included in the tow list, Holford informed Smith that the application would be placed "on file in the event [that the Janesville Police Department] needs to replace or add to its current list." (Smith Dep., Ex. 14 (dkt. #13-14).) Plaintiffs' argument appears to be that Holford placed

Smith's application "on file" because of Smith's race, rather than immediately inspecting Flying A.J.'s facilities and (provided they were qualified) adding the company to the tow list. (Pls.' Opp'n Br. (dkt #30-1) 9.)

As an initial matter, the court notes that the parties dispute whether Holford was even aware of Smith's race when responding to Flying A.J.'s application.[8] Viewing the conflicting evidence in a light most favorable to plaintiffs, however, the court will assume for the purposes of deciding defendants' summary judgment motion that Holford knew Smith was African American. Plaintiffs also emphasize that all four tow companies on the initial list were owned by white individuals and question why Holford placed Flying A.J.'s application "on file," rather than inspecting the company and adding it to the list if qualified. (Pls.' Opp'n Br. (dkt #30-1) 9.) To try to develop an inference of discrimination, plaintiff further alleges that KB Towing -- a white-owned company that was not on the initial list of four -- was added to the tow list on July 8, 2016, four days before Flying A.J.'s was officially added to the list.[9]

Even so, it is undisputed that all towing companies were inspected by Holford before being added to the new tow list, and further that Flying A.J.'s was added to the list the

---

[8] Deputy Chief Holford declares that he didn't know Smith's race until he was forwarded Smith's discrimination complaint at the end of June 2016. (Holford Decl. (dkt. #18) ¶ 18.) In contrast, plaintiffs presented evidence that could at least allow a jury to infer that Holford knew Smith's race well before then. (Defs.' Resp. to Pls.' PFOF (dkt. #38) ¶¶ 10-13.)

[9] Plaintiffs infer that KB Towing was placed on the tow list on July 8, 2016, because on that date KB Towing received a phone call from the Janesville Police Department dispatch center. (Defs.' Resp. to Pls.' PFOF (dkt. #38) ¶ 36.) Defendants acknowledge that KB Towing received a call from the dispatch center on July 8, but disagree that this fact shows that KB Towing was on the tow list. (Id.). For the purposes of the summary judgment motion, the court accepts plaintiffs' reasonable inference.

same day that Holford inspected its facilities. Moreover, at the time Holford issued the original list, the four companies included were not just the only companies that had been inspected by that point, but were also the only companies that had *applied* to be on the list. Therefore, plaintiffs' evidence of discrimination rests principally on the premise that Holford delayed his inspection of Flying A.J.'s facility out of racial animus, while Holford more quickly inspected and approved KB Towing.

Certainly, comparator evidence can support a claim of discrimination provided there are "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Coleman*, 667 F.3d at 841 (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). "Although the 'similarly situated' concept is a flexible one . . . the comparators must be similar enough that differences in their treatment cannot be explained by other variables." *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) (citing *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). The purpose of the comparator analysis is to "eliminate other possible explanatory variables" and to "isolate the critical independent variable -- discriminatory animus." *Coleman*, 667 F.3d at 846.

Here, plaintiffs have simply not come forward with sufficient evidence to adequately isolate discriminatory animus as the independent variable in Holford's actions. While perhaps a question can be raised as to why Holford chose to issue an initial tow list before the application process had been closed, but there is nothing inherently racist in the decision simply because the first four applied were white-owned. Crucially, plaintiffs also

do not eliminate variables that might reasonably explain why KB Towing was inspected prior to Flying A.J.'s. For example, perhaps Flying A.J.'s was not available for inspection before July 12, or maybe KB Towing was quicker to respond to Holford's request to schedule the inspection. Indeed, there is nothing in this record that would assist the trier of fact in finding some kind of preferential treatment, whether in terms of early inspection or placement on the list relative to either company's application. Given that plaintiffs failed to "eliminate other possible explanatory variables," *Coleman*, 667 F.3d at 846, their attempted comparison loses much of its force, and on these facts a jury would be forced to speculate as to why KB Towing was added to the list before Flying A.J.'s.

Having said that, the court agrees that defendants' explanation for Holford's initial decision to place Flying A.J.'s application "on file" is not particularly satisfying. In his declaration, Holford wrote that he initially placed the application "on file" because at the time he had not determined whether the police department needed additional tow companies and also he did not know if Flying A.J.'s met the Police Department's requirements. (Holford Decl. (dkt. #18) ¶ 17.) However, defendants offer no explanation as to why Holford questioned the Janesville Police Department's need for a fifth towing company on June 22, but had decided to add not only a fifth (Flying A.J.'s) but a sixth (KB Towing) company by July 12.

Nevertheless, the question is not whether Holford's reasons for initially placing Flying A.J.'s application "on file" were "inaccurate or unfair," but whether his actions were racially motivated. *Coleman*, 667 F.3d at 852. Other than the insufficient comparator evidence, plaintiffs have done no more than to draw question marks around defendants'

actions. This is not enough to survive summary judgment. The Seventh Circuit has frequently said that this is the "put up or shut up" moment in a lawsuit, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892 (7th Cir. 2003), and unfortunately, while defendants have not presented evidence that *precludes* race being a motivation, that is not their burden; and plaintiffs have not put up sufficient evidence for a reasonable jury to find a discriminatory motive.

Certainly, a reasonable jury could conclude from the record that Smith's complaint of race discrimination spurred defendants to reach out to Smith and revisit his application. Indeed, after the complaint, Moore called Smith to discuss his concerns of discrimination; and on that call, Moore agreed that if Flying A.J.'s met the tow list requirements, he should be included on the list. He also promised that Holford would be in touch to arrange an inspection of Flying A.J.'s facility in Janesville. Two weeks later, Flying A.J.'s was inspected and added to the tow list. While plaintiffs characterize this action as "begrudging," defendants can hardly be faulted for taking Smith's complaint seriously and acting on it.[10]

## B. Defendants' removal of Flying A.J.'s from the tow list

The next incident of discrimination alleged by plaintiffs is Flying A.J.'s removal from the tow list. Plaintiffs' core argument is that defendants embarked on a racially-motivated

---

[10] On the contrary, even in the face of other independent evidence of racial animus, defendants' hasty retreat would probably not be admissible as evidence from which a jury could infer bias under Federal Rule of Evidence 407, precluding evidence of subsequent remedial measures to prove the initial culpable conduct. Specifically, in *Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004), the Seventh Circuit suggested that Rule 407 could be used to prohibit the admission of evidence that an employee was promoted after complaining of sex discrimination as evidence of said discrimination.

investigation that produced "unsubstantiated," "speculate[ve]," "manufactured" and "embellished" complaints against Flying A.J.'s. (Pls.' Opp'n Br. (dkt #30-1) 10-11.) Contrary to plaintiffs' colorful adjectives, however, the complaints to which defendants responded appear based largely on undisputed evidence in the record, and plaintiffs offer no evidence that could create a reasonable inference of discriminatory intent.

Far from being manufactured, the complaints documented in Officer Melton's memo regarding the July 25, 2016, traffic incident reference facts that plaintiffs do not dispute. Plaintiffs agree that Richardson (the Flying A.J.'s driver): did not speak with Paul (the vehicle owner); did not give Paul a ride home; and did not take the car directly to Rock County Honda. Perhaps most crucially, plaintiffs also do not dispute that Paul told Officer Melton that she was unhappy with the tow service's lack of communication *and* that her GPS was not in her vehicle when she got it back, even if Paul did not file an official complaint with the police department. Further, plaintiffs do not dispute that Smith took a week to respond to Holford's first email requesting Smith's comment on the July 25, 2016, incident, nor that Smith thereafter ignored Holford's two requests to meet in person. Finally, in his final email to Smith, Holford *specifically* warned Smith that Flying A.J.'s would be suspended from the tow list if Smith did not reply.

Given this list of undisputed facts, Smith can hardly claim surprise, much less unfair discrimination when, after he still did not reply, Flying A.J.'s was then suspended from the list. Plaintiffs may legitimately believe that the above events did not constitute a lack of professionalism, and that Paul's complaints about Flying A.J.'s were not sufficiently serious to merit removal from the tow list, but the question for the court is not whether defendants'

16

stated reasons were "inaccurate or unfair, but whether [defendants] honestly believed the reasons [they have] offered." *Coleman*, 667 F.3d at 852.

Plaintiffs again attempt to put that question in dispute by arguing that Smith and Flying A.J.'s were treated differently than Don's Towing, a white-owned tow company. Specifically, plaintiffs contend that upon receiving a similar complaint against Don's Towing, Holford responded "far more casually and leniently." (Pls.' Opp'n Br. (dkt #30-1) 18.) Evidence that a defendant "applied its legitimate expectations in a disparate manner" may also be indicative of discrimination. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007). In particular, evidence showing that a plaintiff was treated differently than another person or group can raise an inference of discrimination where there exists "substantial similarity," although not necessarily "complete identity," between the plaintiff and the would-be comparator. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (normally to establish a comparison in an employment discrimination case, the plaintiff must show "that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them").

On this record, however, a reasonable jury could make no such inference. First, the complaints against Don's Towing and Flying A.J.'s are *not* sufficiently similar to provide a reasonable comparison. The complaint against Don's Towing was about an excessive charge and an unstaffed Janesville address. The initial complaint against Flying A.J.'s related to professionalism/customer satisfaction, whether cars were being towed to the

proper address, *and* potential theft of property. In fairness, a later, similar concern was raised as to Flying A.J.'s also having an unstaffed address, but crucially the act precipitating its suspension from the tow list was blatant, repeated unresponsiveness. Moreover, Holford's actual response to Don's Towing was similar to, if not more strict than, his response to Flying A.J.'s. In particular, Holford's first email to Smith simply asked for his response to the complaint against Flying A.J.'s driver's behavior (Holford Decl., Ex. H (dkt. #18-8) 1), while Holford's first email to Don's Towing specifically warned the company that future complaints could result in suspension (Munns Decl., Ex. 1 (dkt. #28-1) 1). In the end, Don's Towing was not suspended from the tow list unlike Flying A.J.'s, but it is also undisputed that Don's Towing responded to Holford's email *within two hours* and addressed Holford's concerns. In contrast, Smith took a week to respond and thereafter ignored Holford's requests to meet.[11]

The only affirmative fact that plaintiffs offer that suggests even a hint of racial animus is Smith's allegation that, when Holford initially met with Smith on July 12, 2016, to inspect Flying A.J.'s facilities, he warned Smith not to bring up race discrimination or he would terminate the interview. (Smith Decl. (dkt. #25) ¶ 11.) As previously noted, Holford denied making any such comment, but the court must assume for purposes of summary judgment that he did so. Further, accepting that such a comment was inappropriate, unprofessional and even offensive, however, the question at hand remains

---

[11] In the case of both Flying A.J.'s and Don's Towing, Holford's initial email only asked for their "response"; neither email included a request to meet in person. (*See* Holford Decl., Ex. H (dkt. #18-8) 1; Munns Decl., Ex. 1 (dkt. #28-1) 1). It was only after Smith's email voicing his strong concerns about the initial complaint and racial discrimination that Holford requested to meet with Smith in person. (*See* Holford Decl., Ex. H (dkt. #18-8) 1.)

whether plaintiffs have presented sufficient evidence to support a finding that defendants intentionally discriminated against plaintiffs on the basis of race. In light of the fact that Flying A.J.'s was admitted to the tow list immediately after that interview, the alleged comment -- although racially charged -- does not support an inference of discriminatory intent in removing it from the tow list more than a month later, especially after an intervening customer complaint and Smith's refusal to meet to discuss that complaint.

Considering all the facts "as a whole," *see Ortiz*, 834 F.3d at 765, plaintiffs have simply not presented sufficient evidence for a reasonable jury to find that defendants intentionally discriminated against them either (1) when they initially placed Smith's application "on file" or (2) when they removed Flying A.J.'s from the tow list. Because intentional discrimination is a required element of both plaintiffs' equal protection and § 1981 discrimination claims, both claims must fail.

### III. Retaliation

Plaintiffs also claim that they were unlawfully retaliated against for complaining of discrimination in violation of § 1981. Specifically, plaintiffs claim that defendants' removal of Flying A.J.'s from the tow list was in retaliation for Smith's complaints of racial discrimination. Section 1981 encompasses a claim of retaliation against a person who has complained about a violation of his (or another person's) § 1981 rights. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008). There must be a causal link between the complaint and the retaliatory action. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). A plaintiff may present direct evidence of retaliation or present indirect evidence to infer retaliation. *See Humphries*, 474 F.3d at 404; *Madlock v. WEB*

19

*Energy Group, Inc.*, 885 F.3d 465, 472 (7th Cir. 2018).

The court agrees that Smith's complaints of racial discrimination were likely protected as asserted violations of his or Flying A.J.'s § 1981 rights, and that defendants' removal of Flying A.J.'s from the tow list would constitute a "retaliatory action,"[12] but plaintiffs have not presented sufficient evidence to establish the requisite causal link. In their responsive brief on summary judgment, plaintiffs suggest that "[i]n this case, timing is a critical factor to the analysis." (Pls.' Opp'n Br. (dkt #30-1) 25.) "[S]uspicious timing . . . can sometimes raise an inference of a causal connection" although "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman*, 667 F.3d at 860 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) and *Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766, 772 (7th Cir. 2008). Further, a timing argument may be diminished by intervening acts that potentially break the causal chain. *See Sun v. Bd. of Trustees of Univ. of IL*, 473 F.3d 799, 816 (7th Cir. 2007) (concluding that the "subsequent [employment] reviews" that occurred after plaintiff's discrimination complaint and before employer's adverse action "break any causal chain between any

---

[12] As defendants point out, § 1981 has not been interpreted to provide a general right to be free from discrimination but rather protects only a person's right to "make and enforce contracts" (among other delineated rights) the same as "white citizens." 42 U.S.C. § 1981. So retaliation claims based on § 1981 must be based on a person's complaint of impairment of these specific rights. Both parties concede that the tow list itself was not a contract (although perhaps plaintiff should not have done so). As a consequence, whether Smith's complaints about the tow list are actually complaints protected under § 1981 is arguable. Moreover, § 1981 retaliation claims are relatively new (the Supreme Court only officially recognized them in 2008 in *Humphries*, 553 U.S. 442) and most cases so far appear to relate to employment discrimination, where the existence of a contract is undisputed. However, the court will assume for purposes of this discussion that removal from the tow list could be an actionable interference with Flying A.J.'s prospective contracts with potential customers with the City of Janesville.

retaliatory conduct" and the adverse action).

Plaintiffs argue that Flying A.J.'s was removed from the tow list on August 29, 2016, because of (1) Smith's June 27, 2016, complaint about discrimination to the city manager and (2) his August 8, 2016, complaint about discrimination to Holford. First, Smith's first complaint is insufficient to prove causality for defendants removal of Flying A.J.'s from the tow list, since defendants first placed Flying A.J.'s on the tow list *after* his first complaint and multiple, intervening events occurred after that, including Flying A.J.'s refusal to respond further to a customer's complaint. Second, no reasonable fact finder could conclude that defendants removed Flying A.J.'s from the tow list in retaliation for Smith's second complaint. Holford received this complaint on August 8 -- after both the July 25 towing incident *and* after Holford had already begun an investigation into that incident. Even though Smith's August 8 complaint occurred in close temporal proximity to his August 29 removal from the tow list, Holford's investigation into the July 25 towing incident and Smith's repeated failure to respond to Holford's communications again break the causal chain. *See, e.g., Hatchett v. Shinseki*, 957 F. Supp. 2d 960, 974-75 (S.D. Ind. 2013) (concluding that plaintiff's timing argument failed because, although employer's adverse action occurred seven days after plaintiff's discrimination complaint, during that same week employer received unrelated complaints about plaintiff's performance). Finally, Holford's direct response to Smith's second complaint was accommodating, not retaliatory; he offered twice to meet with Smith in person to discuss the situation; and it was only after Smith failed to respond that Flying A.J.'s was removed from the tow list.

Moreover, the Seventh Circuit "has held repeatedly that temporal proximity alone is not sufficient to withstand summary judgment." *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751-52 (7th Cir. 2009) (citing cases).  Here, plaintiffs' only additional argument is to once again compare Flying A.J.'s with Don's Towing.  But as discussed above, this comparison raises no improper motive because:  (1) Don's Towing was not similarly situated to Flying A.J.'s; (2) the complaint against Don's Towing was fundamentally different than the complaints against Flying A.J.'s; and (3) Holford's reaction to the complaint against Don's Towing was similar to, and arguably more strict than, his response to the complaint against Flying A.J.'s.  Because plaintiffs have failed to offer evidence of a causal link between plaintiffs' complaints and the alleged retaliatory actions beyond suspicious timing, their claim of retaliation under § 1981 also fails.

ORDER

IT IS ORDERED that:

1)  defendants' motion for summary judgment (dkt. #14) on all claims is GRANTED;

2)  both parties' motions in limine (dkts. ##49, 56) are DENIED as moot.

Entered this 17th day of October, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge